UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

BABY "A" ROE, et al.,

        Plaintiffs,                  21 Civ. 468(CM)(GWG)

-against-

CNTP MCB INC.,

        Defendant.

———————————————————————x

**ORDER DENYING THE MOTION FOR ENTRY OF A DEFAULT JUDGMENT AND OUTLINING THE ISSUES THAT WILL NEED TO BE ADDRESSED AT SUCH INQUEST**

McMahon, J.:

The complaint in this action alleges that the parents of Babies "A" and "B" Roe, who have been permitted to sue *sub nom* Jane Roe and Mary Roe in order to protect the identity of the minor children (*see* Docket # 8), were damaged as a result of receiving "defective" sperm from the defendant sperm bank, which is located here in New York City. The Roe Family lives in Northern California. The babies, twin boys, suffer from "various ailments" including gastro-esophageal reflux; at least Baby A suffers from autism. The twins were conceived using the sperm of "Donor 121." Neither the Plaintiff Mothers nor the Defendant sperm bank had any of Donor 121's sperm left after the births of the children, so it could not be tested at that time for "defects" and cannot be tested now.

The complaint alleges both breach of contract and fraud arising out of the same facts. Paragraph 4 of the Sperm Purchase Agreement between Plaintiff Mothers and Manhattan Cryobank, the predecessor in interest of Defendant, provides as follows:

> Manhattan Cryobank acknowledged that they [*sic*] have performed a complete
> and thorough screening of the donor(s) for inheritable birth defects, inheritable serious
> illnesses that could be fatal, life threatening, or could result in permanent impairment
> of a body function or permanent damage to a body structure and for infectious
> diseases and, further, that they [*sic*] have found no evidence of such inheritable
> birth defects, serious illness or infectious disease in the donor's whose semen will
> be used in the RECIPIENT's reproductive procedure.

Plaintiffs allege both that Manhattan Cryobank breached its contract with them (I assume by failing to perform the promised "complete and thorough screening," since that is the only promise made in Paragraph 4 that is capable of being performed), and that it defrauded them (by representing to them that it found no evidence that Donor 121 was a carrier of "inheritable birth defects, serious Illness or infectious disease"). In support of these allegations, it is alleged that an employee of a sperm bank in California, which is/was somehow related to the Defendant sperm bank, advised the plaintiff parents that another baby born using sperm from Donor 121 suffered from a speech delay.

The Plaintiff mothers seek damages for the emotional and physical distress they have suffered and are suffering as a result of having less-than-perfect children, as well as damages to redress the cost of raising developmentally impaired children. They also seek injunctive relief of an unspecified nature.

**Service of Process and Entry of Default**

This action was commenced by the filing of a complaint on January 19, 2021. The docket sheet reflects that Defendant was served on February 2, 2021, by serving a copy of the summons and complaint on the Secretary of State of New York. (Docket #9.) No appearance having been entered within 21 days (Fed. R. Civ. P. 12(a)), the Clerk issued a Certificate of Default on February 24, 2021 (Docket # 13) – even though it is highly unlikely, given the pandemic, that the Secretary of State had managed to forward process to the defendant during that period.

On March 11, 2021, plaintiff's counsel failed a notice of motion for a default judgment. To guard against inadvertent defaults (such as those that might occur during a pandemic, when the Secretary of State's office is not operating at full capacity, such that things might fall through the cracks), this court's Individual Rules provide that service of such a motion must be on 30 (not 21) days' notice to the defaulting party, and that the motion papers must be served in the same manner as service of the summons and complaint. This plaintiff's counsel did not effect such service until April 13, 2021. (Docket #22.) Predictably, service of the motion was accomplished by going back to the Secretary of State's office and leaving two sets of the default judgment papers with a clerk there.

Thirty days and more have passed since the second trip to Albany. No one has yet entered an appearance for the defendant. Plaintiffs ask that their motion for a default judgment be granted.

**Salient Procedural Facts**

The contract between Plaintiffs and Defendant provides in no uncertain terms for arbitration. (Complaint ¶ 9.) Plaintiffs commenced an arbitration before the designated disputed resolution forum (JAMS) in May 2020, and even paid the filing fee for Defendant as well as for themselves. JAMS was allegedly unable to contact the Defendant and it never appeared. (Complaint ¶ 11.) Plaintiffs discontinued the arbitration in November 2020 in favor of bringing this action.

## DISCUSSION

A court may, but is not required to, enter a default judgment against a defendant who has been properly served, but failed to appear. Pinaud v. County of Suffolk, 52 F.3d 1139, 1152 n. 11 (2d Cir. 1995). The Second Circuit has noted that "dispositions of motions for entries of defaults and default judgments. . . are left to the sound discretion of a district court." Shah v. N.Y. State

Dep't of Civil, Serv., 168 F.3d 610, 615 (2d Cir. 1999) (quoting Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95 (2d Cir. 1993)).

The mere fact that no answer has been filed is insufficient to allow the court to enter a default judgment. "Rule 55 sets forth a two-step process for an entry of default judgment." GuideOne Specialty Mutual Ins. Co. v. Rock Community Church, Inc., 696 F. Supp. 2d 203, 208 (E.D.N.Y. 2010) (citing Enron, 10 F.3d at 95-96)). Plaintiffs seeking default must clear two hurdles: they must both prove that the court has jurisdiction over the defendant, and establish that the facts pleaded entitle them to relief as a matter of law.

First the plaintiff must establish to the court's satisfaction that a defendant again whom default is sought has in fact been served with process. "[S]ervice of [process] is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." Mississippi Publ'g Corp. v. Murphree, 326 U.S. 438, 444-45 (1946). "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of [process] must be satisfied." Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co., 484 U.S. 97, 104 (1987). Ergo the movant must file an affidavit demonstrating that the party against whom default judgment is sought has been properly served and has failed to defend. At that point the Clerk of Court "must" note the party's default on the record. Fed. R. Civ. P. 55(a); Local Rule 55.1. This is done by issuing a certificate of default.

At the second step, the plaintiff applies to the court for a judgment. "[A]fter the clerk of the court enters default against a party, if that party fails to appear or otherwise move to set aside the default pursuant to Rule 55(c), the court may enter default judgment." GuideOne Specialty Mut. Ins. Co., 696 F. Supp. 2d at 208 (citing Fed. R. Civ. P. 55(b)). The operative word in that sentence is "may." A court retains discretion to determine whether a final default judgment is

appropriate. See Enron 10 F.3d at 95. In light of the Second Circuit's "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored." See Enron, 10 F.3d at 95-96.

Thus, despite a defendant's default, the plaintiff bears the burden of demonstrating that the unchallenged allegations and all reasonable inferences drawn from the evidence provided establish the defendant's liability on each asserted cause of action. See City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011); Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).[1] If liability is established as to a defaulting defendant, then the Court must conduct an analysis to establish damages to a "reasonable certainty." Credit Lyonnais Sec. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999).

As there seems to be no question that defendant was duly served in compliance with the rules (though the court is unsure whether it has actually received notice of the lawsuit), we turn to step two of the default process: whether the unchallenged assertions entitle the plaintiffs to judgment.

They do not.

**The Motion Is Denied Because The Well Pleaded Facts of the Complaint Do Not Entitle Plaintiff To Relief Without the Introduction of Additional Evidence**

The well-pleaded facts establish the following:

1.      Plaintiffs purchased Donor 121's sperm from the defendant and used the same to conceive their sons in 2017. The babies were born in February 2018. (Complaint ¶¶ 13, 15.)

2.      One of Plaintiff's sons (Baby A) has autism; the other (Baby B) has delayed speech and anemia; both boys have had GERD from an early age. (*Id.* ¶¶ 16, 18, 24.)

---

[1]     Interestingly – and significantly – JAMS has a similar requirement. It will not simply enter judgment after a default, but requires a claimant to "submit such evidence as the Arbitrator may require for the rendering of an Award." JAMS Rule 22(j).

3. Plaintiffs have been unable to contact the Defendant sperm bank despite multiple attempts to do so. (*Id.* ¶ 28.)

4. Plaintiffs obtained a profile of Donor 121 from a California sperm bank that had a "working relationship" with Defendant. (*Id.* ¶ 29.)

5. There were missing pages in the profile and at least one (unspecified) question was not answered. (*Ibid.*)

6. The manager of the California sperm bank told Plaintiff Jane Roe that the sperm donor had originally donated in 2008; that "sufficient testing" had not been done at that time; and that the donor's sperm had not been retested. (*Id.* ¶ 30.) Obviously, this testimony would not be admitted at trial – at least without a rather extensive *voir dire* – since as pleaded, the information was received from someone who did not work at the Defendant sperm bank, not from the Defendant or from its business records, and so is rank hearsay if offered for the truth of the matter asserted.

7. The donor's "long profile" showed that he had a history of anemia.[2] (*Id.* ¶ 32.)

8. The manager in California told Jane Roe that another child conceived with Donor 121's sperm had a speech delay. (*Id.* ¶ 31.) This, too, runs afoul of the hearsay rule.

Those are the pleaded facts. At least Facts 6 and 8 are not "well pleaded" if offered for the truth of the matter asserted.

The well pleaded facts do not in and of themselves entitle the plaintiffs to relief.

The court will not grant the motion for a default judgment because I cannot say, even drawing inferences in favor of the Plaintiffs, that the well-pleaded facts entitled Plaintiffs to relief.

---

[2] The complaint says that "at a minimum" he had a history of anemia, but the complaint pleads no other facts that would shed any light on whether there were any other medical conditions from which Donor 121 suffered.

In fact, I would not grant the motion even if I were to consider Facts 6 and 8 (the hearsay statements) to be true.

Basically, what Plaintiffs want me to do is fall victim to the *post ergo propter hoc* fallacy: since Y happened after X, X must have caused Y. Or, putting it in terms of the facts of this case: Babies A and B Roe were conceived with Donor 121's sperm; Baby A has autism and GERD and Baby B has delays in speech, anemia and GERD; ergo Donor 121 must have had defective sperm and that sperm caused these disorders. However, the conclusion does not necessarily follow from the complaint's premise.

There is much missing from the complaint that would be needed before the court could conclude that Donor 121's sperm caused Baby A to suffer from autism (to take what I perceive to be the most serious allegation) or from any other medical or developmental condition that could have been uncovered via appropriate and available genetic testing . The contract that was allegedly breached in this case required MCB to test for "inheritable birth defects, inheritable serious illnesses that could be fatal, life threatening, or could result in permanent impairment of a body function or permanent damage to a body structure and infectious diseases." It is far from apparent that autism falls within this definition. While experts agree that a tendency to autism can be inherited (a fact not pleaded in the complaint, but which the court will not ignore for purposes of this motion), over 100 different genes have been identified that are thought to contribute to autism.[3] The complaint does not allege either that (1) Baby A carries any of those genes, or that (2) the genetic mother of the child[4] does not carry any of those genes. Lacking any paternal sperm that

---

[3] Jessica Wright, *Analysis of sequences pegs 102 top autism genes*, Spectrum (Jan. 24, 2020) https://www.spectrumnews.org/news/analysis-sequences-pegs-102-top-autism-genes/.
[4] The complaint does not allege whether Jane Doe, Mary Doe, or a third party is the genetic mother of Babies A and/or B.

can be tested, one would need to know both of these things in order to attribute inheritance of autism-associated genes to the father.

Moreover, it is far from clear to the court that even knowing these two facts would admit of an inference that Donor 121's sperm "caused," for example, Baby A's autism. Maternal and environmental factors may come into play as well.[5] One of two identical twins can have autism and the other not, or not to the same degree, even though identical twins have the same genetic profile, which is all that a sperm donor can provide.[6] I cannot tell from the complaint whether Babies A and B are identical or fraternal twins, but if they are identical and only one has autism, then something other than genetic factors could well be at play. This may also be the case with the other disorders identified in the complaint. These issues would have to be addressed – quite possibly with expert testimony – in order to develop enough facts to allow for a finding that Donor 121's sperm was the cause of the various medical and developmental conditions exhibited by Babies A and B.

Testimony would also be needed to establish the meaning of the terms "inheritable birth defects" or "inheritable serious illnesses that could be fatal, life threatening, or could result in permanent impairment of a body function or permanent damage to a body structure," as used in the contract between plaintiffs and Manhattan Cryobank.[7] Not every medical condition that manifests in an infant or young child would necessarily fall within the court's understanding of

---

[5] *See, e.g, Identical twins with autism differ significantly in severity of social traits*, Autism Speaks (Jan. 14, 2020), www.autismspeaks.org/science-news/identical-twins-autism-differ-significantly-severity-social-traits (positing that environmental factors early in life are a significant influence on the development and manifestation of autism).

[6] Studies appear to show that when one monozygotic twin has autism, the other is somewhere on the autism spectrum between 60-90% of the time.

[7] I do not understand any of the medical conditions identified in the complaint to qualify as "infectious diseases," which are diseases passed from one person to another via bacteria, viruses, fungi or parasites – herpes simplex being an example of an infectious disease that is not genetic in nature but that can be passed, albeit from mother to child, during the birth process. It may be that there are "infectious diseases" carried in sperm, but as I cannot infer that from my understanding of the term, someone would have to testify about it.

those terms.  For example, delayed speech would not seem to qualify as either a birth defect or permanent impairment of any bodily function; the same is true of GERD, which is not generally thought to be either a birth defect or life threatening.

It seems to me that there are two aspects to this question. One is whether there is a general understanding in the medical community about what the terms used in the contract mean; the other is whether there is an understanding specific to the sperm donor industry, since these are conditions for which the sperm bank agreed to test. The meaning of these terms is certainly not self-evident or unambiguous. I do not know whether it is possible to do a screening test on sperm for "autism" or "GERD" or "delayed speech." If there is no test that would uncover the conditions that afflict Babies A and B, then it may well be that those terms as used in this contract could not be interpreted to cover those conditions – otherwise, performance of the contract would be impossible. It may be that the sperm bank tested the sperm for all the defects for which it was possible to test, in which case there was no breach of contract. The fact that the children have medical or developmental conditions does not establish that all the testing that was possible was not performed; neither does the hearsay statement of an employee at a different sperm bank. And what the sperm bank represented to the parents about the type of testing that was being done would of course play into the fraud claim – assuming that a misrepresentation claim is legally cognizable, since what is alleged is essentially a breach of contract.

Inheritance is a complicated matter. The court is willing to receive evidence that would support the conclusion plaintiffs wish me to draw – namely, that sperm from Donor 121 was the but for cause of the conditions from which Babies A and B suffer. If the defendant continues to absent itself from these proceedings, plaintiffs may well prevail, even if there were contradictory evidence that could be introduced. But the text of the complaint simply does not admit of the inference that Donor 121's sperm is the reason that the twins have medical or developmental conditions. Therefore, even assuming the well-pleaded (non-hearsay) facts to true, the motion for a default judgment must be denied, because those facts, without more, are insufficient to establish liability. If plaintiffs want to recover from defendant, they will have to prove their case – just as they would have had to at JAMS in light of the defendant's default (*see* n.1, *supra*).

The motion for a default judgment is denied. This constitutes a written opinion. The Clerk is directed to remove the motion at Docket #16 from the court's list of open motions.

Dated: June 3, 2021

_____
U.S.D.J.

BY ECF TO COUNSEL